And we move on to our final case for this morning, Sibanda v. Holder. Hello, Mr. Conte. Long time no see. Good morning. Good morning, judges. Lots of old friends this morning. May it please the Court, my name is Suare Conte. I represent Ms. Lucy Sibanda, the petitioner in this case. Once again, this Court is confronted with the issue of corroborative evidence in asylum cases. The difference between some of the cases that this Court has looked at in this case is that we submit to the Court that Sibanda's testimony during the immigration proceeding was credible, persuasive, and referred to specific facts. So as such, Your Honors, we don't believe that she was required to present corroborative evidence regarding her asylum claims. But under the Real ID Act, isn't the immigration judge or isn't the Board entitled to require corroborative evidence in any case? Yes. Yes, the petitioner is required to do so under the Real ID Act, but there is a little exception to that, Your Honor. And that is if the petitioner is unable or there is no way for the petitioner to produce corroborative evidence, that should be taken into account, especially if the petitioner is deemed to be credible. And that's what happened in this case. Did the IJ find her to be credible? He did not explicitly find her to be credible, but he did indicate in some instances that he credited her testimony. However, the Board of Immigration Appeals deemed her credible. The Board did deem you credible? Yes, Your Honor. The Board of Immigration Appeals did. The Board specifically says, as I recall, that it's treating her testimony as credible. Yes. Yes, Your Honor. Now, I think the two issues here, number one is regarding whether or not Ms. Zibanda belonged to a social group. And the Board indicated in its opinion that Ms. Zibanda did not produce any corroborative evidence to indicate that, in fact, she belonged to a social group in that women in Zimbabwe, particularly in the Ndebele ethnic group, who have, their parents have received a bride price, otherwise known as a lobola, are subject to the whims and caprices. So your defined group is women or widows, women whose family have paid a bride price, who are from one of these groups, the Ndebele or the Shona group? Yes, Your Honor, that is our position. However... Would it be women or just widows? Just women whose parents received bride price, not just widows, Your Honor. And the Board of Immigration Appeals really never discussed the issue of whether or not this group of women belonged to a social group. They were only indicating that no corroborative evidence was submitted to support that. And this is a traditional African manifestation, Your Honor. It's very difficult, and this Court has noted in a few cases, not in all instances which you have written documentation to support certain facts that you presented before immigration. Is this throughout Zimbabwe, or is it by region, by tribe, by what, I mean... Your Honor, it was specifically noted that this is a practice between, among the Shona and the Ndebele ethnic group. Is that a regional... It is a southern area of Zimbabwe, Your Honor. In fact, during the hearing, although the Board of Immigration Appeals disavowed the conduct of the immigration judge, the immigration judge looked up the Wikipedia to see if, in fact, this practice was present in that region of Zimbabwe. And he saw that it was. I mean, I guess he was sitting there playing with Wikipedia during the hearing, and he saw that, indeed, it is there. Yes, Your Honor. In fact, he did confirm that. Now, some of the specific details of how this cultural is manifested is very individual-specific. Well, it shows up, doesn't it, also in the State Department reports, which are government publications that the immigration judges frequently consult. Well, and that's one of the issues in this case. The Board of Immigration Appeals constantly indicated that Ms. Zimbanda did not introduce into evidence the State Department cultural report. And one of the cases that the Board of Immigration Appeals had looked at, the SMJ case, which is, in fact, also a case that deals with corroborative evidence, this suggests that the government cannot sit and abide. They are required to introduce evidence. In this case, most times in immigration practices, you go to hearings, that's the only thing that the government attorneys will present, the State Department cultural report. In this case, they did not, and then blamed the petitioner for not submitting. Is there law that says that they can be considered only if they're formally proffered into evidence, or can the immigration judge or the board or this court simply take judicial notice that the State Department issues, say, a report on Zimbabwe? Well, Joanne, I would assume this. In fact, even during trial, the immigration judge himself indicated that he was aware of the political situations in Zimbabwe. So in his search, he acknowledged being aware of country conditions. So I don't think, I think like the court rightly pointed out, he should have taken judicial notice of that instead of requiring the petitioner to submit the cultural report itself into evidence. So let's get back to the corroboration point, because I think that's really critical in understanding the Board of Immigration Appeals decision. Ms. Sibanda really doesn't give very much. Is there anything she puts in the record other than her own testimony that you would point to as corroboration? Yes, Your Honor. There is a letter that her son wrote back in 2008, and that was part of it. Which son was that? The teenage son, and it's on page 219 of the appendix. Jabulo? Yes, Your Honor. In fact, in that document, although the letter that he sent did not parrot Ms. Sibanda's testimony, it did indicate that she should not come back to Zimbabwe because he overheard his uncles indicate that, in fact, they were going to use witchcraft to kill her. Now, this is not the son who witnessed the attempted rape, I take it? At the time that, in fact, all of the children were present when this attempted rape occurred. Now, and I have to also caution that it is not like they were present in the room where the attempted rape took place. They were in the premises when this occurred. Now, one of the things that the Board of Immigration Appeals was requesting is that they should have produced statements from some of these children regarding the attempted rape. And, in fact, the immigration judge minimized the fact that attempted rape could be a form of persecution. But we're not saying that the sons were really present in the room, but they were aware of the circumstances involving their mother and their uncle. So there is some evidence in the record to suggest that, in fact, Ms. Sibanda had been subject to persecution. The son talks about the fact that the house was sold. The houses that they were supposed to inherit from their father were sold by their uncle. It's in that letter. So the fact that the testimony did not repeat exactly what Ms. Sibanda testified to in court cannot be suggested to be non-corroborative evidence. So the status of the women whose parents received Lobolo is very clear by her own testimony. They become the subject and property of their husbands. They also, if the husband dies, like in this case, they are required to marry the brother of the husband, whether the older or the younger brother. It doesn't matter. So the immigration judge thought that the Lobolo is very much like Dowry. And then he indicated that it was part of the bargain and that there was a little banter between myself and the immigration judge regarding, we compared that to the situation regarding FGM. And we indicated that in FGM cases, some of the activities are considered pernicious but accepted in the countries that they were practicing. So you can say Lobolo is part of the bargain here in Zimbabwe, but the effects of the Lobolo are not something that this country would tolerate. So we believe that there was some evidence, even not overwhelming, but the fact is her testimony was deemed credible and there was nothing from the government side to dispute her position. So we believe that she should have been given the relief that she was seeking. All right, well you can save a minute for rebuttal and we'll hear from the government school. May it please the court, Alyssa Gould on behalf of Attorney General Eric Holder. Asylum applicants like Ms. Zabanda bear the burden of proof as to the facts of their claims. Under the Real ID Act, as the court noted, where an immigration judge determines that an otherwise credible applicant should produce corroborating evidence, it must be provided unless the applicant doesn't have it and cannot reasonably obtain it. There is no exception. So why doesn't that exception apply here? Do we really think that Major Zabanda was going to submit an affidavit saying, yes, I've tried to rape her lots of times and I'm going to do it again because it's my right under Zimbabwean law as her brother-in-law? Of course not, Your Honor. We wouldn't expect any documentation from any asylum applicant's persecutor. Well, and likewise from the police because it would appear that he would have special influence with the police. They say this is a family matter, we're not going to do anything. How can she get a police report to corroborate her reports of the assault? Whether or not she could have obtained a police report or court documents showing that she went to the court, the fact of the matter is that she never testified as to whether she made any effort to obtain that evidence. But she does testify that she goes to the police a couple of times and they blow her off. They say this is a family matter, we're not going to interfere, so she leaves. I doubt there's any paper record at all. That may be the case, Your Honor, but the fact is that she never said there is no paper. Well, how would she know? I mean, she testifies to what happens. It seems to me this is pretty good testimony that there isn't anything. And the one thing that she does have is the older son, not the son who wrote the letter that she proffers at the hearing, but the other son, I think his name is Brian or something like that. He's the one who the abusive relative, Major Sabanda, threatens to kill if he goes to the police. So it seems to me the fact that he hasn't written a letter is understandable, too, unless our government has decided to ask people to risk their lives to submit letters. At one point, Your Honor, Ms. Sabanda actually testified that her son, and she wasn't clear as to which son, but it could very well have been that particular son, she testified that he wrote her a letter that this individual still wanted to marry her. She simply didn't have it. She never alleged that it would have been dangerous to obtain letters from her children. Well, no, but she does say the letter from Jabulo that's in says if she returns, Major Sabanda and his brother intend to kill her for reporting them to the police. It reminds me of this Court's honor killing cases. Honor killing is also part of the culture of some countries, and we've said that we shouldn't send people back to be subjected to an honor killing. That may be the case, but it appears from that letter that it really only references the situation regarding the property dispute and the inheritance of her husband's homes and the sale thereof. It doesn't actually reference any of the situation regarding dowry, regarding marriage to Major Sabanda. It simply doesn't discuss those issues. What it does prove is that Ms. Sabanda is actually able to obtain letters from Zimbabwe from her friends and family, and she did not present any other evidence from anyone who was aware of her claim there, not just her sons but, for example, her sister. She bore the burden of proving that she could not reasonably obtain evidence under the Real ID Act, and it may be the case that she couldn't obtain evidence, but nowhere has she offered any explanation or any reason that she might have been unable to do so. Well, there was some inference that perhaps the police don't even record it. I mean, in this situation, they told her to go away? That may very well be the case, Your Honor, but under the Real ID Act... So you're down to letters. I mean, actually, you've conceded that she's not going to get any direct evidence. You've conceded that she's not going to get anything from the police. You've conceded that the government is not prepared to protect her human rights because she goes to them and they say, we're not listening to you. We've got this Lobolo tradition that isn't just about property, but it's about ownership of the woman who is sold by her family to somebody else, and she just kind of passes down as an inheritance when the one guy dies. So you're left with letters, and she has a letter. She doesn't have a whole raft of letters. Your Honor, she had three years to attempt to attain any corroborating evidence, and, in fact, I don't have... You know what? What's the political situation been like in Zimbabwe for the last three years? That's not a matter that's on this Court's record, so I can't speculate to it. Well, we all read the newspaper. How about the country reports? Is it in that? The country reports were not submitted by... Well, they don't have to be. We can take a look at them. Sure, and I can't speak to whether certainly the political situation in Zimbabwe is horrendous. Everyone recognizes that. It's a mess, right? I mean, you'll agree with that. However, there's no corroborating evidence in this record that addresses the particular issue in this claim. This is not a political asylum case. This is not a matter of government activism. It's a question about this bride price and whether Ms. Savanda would have had to marry her brother. No, but if the government is falling apart and not functioning, it's pretty hard to get corroborating evidence, isn't it? Except that Ms. Savanda did bring with her at least some corroborating evidence. That's the critical thing. Or had mailed to her. More contemporaneous letters. We don't know how well the mails were working. There's nothing in the record to indicate whether she actually brought that evidence with her. It does appear that a letter was mailed to her from Zimbabwe. And, again, she bears the burden to explain whether or not she could reasonably obtain evidence. All she had to say in this case was, I was not able to obtain corroboration, and here are the reasons why. And then she could potentially have met her burden of proof. And it does happen that the 2011 State Department Country Report on Human Rights Practices mentions the vulnerability of women to entrenched practices, including forcing widows to marry the brothers of their late spouses. So, I mean, that is there on the State Department's website. This Court's scope of review is limited to the administrative record before it, as was the Board's, and since that State Department report was not introduced, it's not. No, wait a minute. I'm not so sure that's the law, that we can't take judicial notice of it. This Court has taken judicial notice of background evidence, but not in a case that I'm aware of where the actual issue in the case was the burden of production and corroboration. So that would be really weird. If the State Department report had said, you know, widows who, I'm hypothesizing, not what it says, but if it had said, widows who refuse to marry the brothers of their late spouses are summarily executed, your position would be that we have to send her back to Zimbabwe anyway, because somebody forgot to introduce that into the record, even though the United States State Department has said that? Of course not, Your Honor. The question would be whether the record and additional evidence compels a contrary conclusion to the agency's, and it would certainly be up to the Court to make that determination. However, the record and the testimony in this case do not compel a contrary conclusion. Nothing in the record indicates anything similar to these. Everything in the record from her credible testimony indicates that she's become a piece of furniture that moves from one owner to the next, except a piece of furniture who's capable of being raped. Respectfully, Your Honor, the immigration judge and the board both concluded that her testimony, even though it was credible as to some basic facts, raised a whole host of questions as to what the obligations and intentions were under what may have been customary law. It didn't in any way settle those particular matters. I think they may have also been proceeding in a bit of tension with our definition of what it takes to be a social group, because we've disapproved this in this circuit, but the board has had this visibility standard that we think is not correct under the law, under our embanked decision in C.C. against Holder, and so I think there are other issues there that might need consideration. If this court reverses the agency's determination regarding corroboration, clearly it needs to be remanded for the board to address the social group issue in the first instance, especially in light of recent case law, but it did not consider social group because it considered the corroboration issue dispositive here. That's the way I read it as well. If there are no further questions. I don't think so, so thank you very much. Mr. Conte, anything further? No, Your Honor. All right. Well, thank you very much. Thanks to both counsel. We will take this case under advisement, and the court will be adjourned.